David E. Weiss (148147)
Email: dweiss@reedsmith.com
Carolee A. Hoover (282018)
Email: choover@reedsmith.com
REED SMITH LLP
101 Second Street
Suite 1800
San Francisco, CA 94105-3659
Telephone: +1 415 543 8700
Facsimile: +1 415 391 8269

Attorneys for Plaintiffs
CoreLogic, Inc., CoreLogic Default
Information Services, LLC and
CoreLogic Solutions, LLC

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| CORELOGIC, INC., a Delaware corporation; CORELOGIC DEFAULT INFORMATION SERVICES, LLC, a Florida limited liability company; and CORELOGIC SOLUTIONS, LLC, a California limited liability company;<br><br>Plaintiff,<br><br>vs.<br><br>ZURICH AMERICAN INSURANCE COMPANY, a New York corporation; FIDELITY AND DEPOSIT COMPANY OF MARYLAND, a Maryland corporation and subsidiary of Zurich American Insurance Company, and DOES 1 through 25, inclusive ,<br><br>Defendants. | No.: 15-3081<br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs CoreLogic, Inc., CoreLogic Default Information Services, LLC, and CoreLogic Solutions, LLC hereby alleges as follows:

## **PARTIES**

1.  Plaintiff CoreLogic, Inc. is, and, at all relevant times, was a Delaware corporation with its principal place of business in Irvine, California. CoreLogic, Inc.,

through its operating subsidiaries, provides global property information, analytics and data-enabled solutions in the real estate and mortgage finance, insurance, capital markets, transportation and government sectors, including but not limited to residential valuation services ("RVS") nationwide to its customers, many of which are large financial institutions.

2. Plaintiff CoreLogic Default Information Services, LLC (hereinafter referred to as "CoreLogic Default Information Services") is, and, at all relevant times, was a Florida limited liability company with a principal place of business in Westlake, Texas. CoreLogic Default Information Services is a subsidiary of CoreLogic, Inc. and was the parent company of CoreLogic Collateral Solutions, LLC, ("CCS") a Delaware limited liability company, prior to the sale of CCS in September of 2014 (the "CCS Sale"). Pursuant to the sale of CCS, CoreLogic Default Information Services retained certain assets including the claims asserted in this litigation.

3. Plaintiff CoreLogic Solutions, LLC (hereinafter referred to as "CoreLogic Solutions") is, and, at all relevant times, was a California limited liability company with a principal place of business in Irvine, California. CoreLogic Solutions is a subsidiary of CoreLogic, Inc. Collectively, CoreLogic, Inc., CoreLogic Default Information Services, and CoreLogic Solutions, LLC are referred to herein as "CoreLogic" or "Plaintiffs"). Pursuant to the sale of CCS, CoreLogic Solutions retained certain assets including the claims asserted in this litigation.

4. Defendant Zurich American Insurance Company (hereinafter referred to together with its agents as "Zurich" or "Defendant") is, and, at all relevant times, was a New York corporation with a principal place of business in Schaumburg, Illinois. Zurich is a member company of Zurich Insurance Group and provides multiple lines of insurance to individuals and corporate entities throughout North America, including but not limited to commercial surety licenses and permit bonds. Zurich is, and, at all relevant times, was authorized to do business in California and Utah.

5. Defendant Fidelity and Deposit Company of Maryland (hereinafter

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

1 referred to together with its agents as "Fidelity" or "Defendant") is and at all relevant
2 times, was a Maryland corporation and a subsidiary of Zurich with a principal place of
3 business in Schaumburg, Illinois. Fidelity provides commercial surety bonds,
4 including license and permit bonds to Zurich customers, including but not limited to
5 CCS. Fidelity is, and, at all relevant times, was authorized to do business in California
6 and Utah.

7   6.   Plaintiffs do not know the true names and capacities of Defendants sued
8 here as Does 1 to 25, inclusive, and therefore sues these Defendants by such fictitious
9 names. Plaintiffs will amend this Complaint to allege their true names and capacities
10 when ascertained. Each of the fictitiously named Defendants are in some manner
11 responsible for the acts, occurrences and transactions set forth herein and are legally
12 liable to Plaintiffs.

13   7.   Except as otherwise expressly alleged herein, Plaintiffs, on information
14 and belief, allege that each Defendant was at all relevant times the agent or employee
15 of each of the other remaining Defendants identified in this Complaint, and in doing
16 the acts alleged herein acted in the scope of such agency or employment, and
17 confirmed and ratified each and every act, or omission, of each of the remaining
18 Defendants. Each Defendant accepted the benefits of their wrongful conduct, and
19 failed to repudiate the misconduct. Plaintiffs will amend this Complaint to allege their
20 true names and capacities when ascertained.

21 **JURISDICTION, VENUE, AND INTRADISTRICT ASSIGNMENT**

22   8.   This Court has personal jurisdiction over the Defendants because the
23 Defendants have transacted business in this District.

24   9.   This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 in
25 that: (a) Plaintiffs and Defendants, and each of them, have diversity of citizenship, and
26 (b) the amount in controversy exceeds $75,000.00.

27   10.   Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2)
28 because a substantial part of the events or omissions giving rise to the claim occurred

1  in San Francisco, California.

2  11.  Intradistrict assignment in the San Francisco Division is property
3  pursuant to Civil L.R. 3-2(c) as a substantial part of the events or omissions which
4  give rise to the claim occurred in San Francisco, California.

## FACTS COMMON TO ALL CAUSES OF ACTION

6  12.  Pursuant to master servicing agreements between CoreLogic, Inc. and its
7  customers, CoreLogic, Inc.'s operating subsidiaries enter into statements of work to
8  provide various services to CoreLogic customers.  These services have included RVS,
9  appraisals, residential evaluation reports, and broker price opinions, primarily in the
10 area of mortgage loan default servicing nationwide.

11  13.  At all relevant times, CCS was a national appraisal management
12 company ("AMC") with its principal operations in Sandy, Utah.   CCS provided RVS
13 services to CoreLogic customers, including large financial institutions, pursuant to
14 statements of work.

### Issuance of The Utah Bond and Zurich's Miscoding Error

16  14.  In 2009, Utah enacted the Appraisal Management Company Registration
17 and Regulation Act, which required all AMCs operating in Utah to register with the
18 Division of Real Estate of the Department of Commerce of Utah (the "Division").

19  15.  On July 2, 2012, CCS was issued its Utah AMC Registration 8371520-
20 AMC (the "Utah AMC License") with an expiration date of July 31, 2014.  As CCS
21 provided appraisal services nationwide and at all relevant time periods, CCS also
22 registered with and maintained active AMC licenses in all states which required same.

23  16.  In 2012, Utah enacted the requirement that all AMCs operating in Utah
24 maintain a $25,000 surety bond in order to register or renew their licenses. See Utah
25 Code § 61-2e-204.  Pursuant to R162-2e-201(4)(a)(iii) enacted by the Division to
26 enforce the Utah AMC requirements and effective September 26, 2012, CCS was
27 required to have the $25,000 surety bond in place by January 1, 2013.  Currently, 20
28 states require AMCs to carry valid surety bonds ranging from $20,000 to $100,000.

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

17. On November 27, 2012, Fidelity and/or its agent, prepared and issued a continuous surety bond, identified as Bond No. 9044150 on behalf of CCS, in the amount of $25,000 (the "Bond") in favor of the Division. The Bond became effective on January 1, 2013 and is renewable year to year through a continuation certification executed by or on behalf of Fidelity.

18. Zurich maintains records of the AMC surety bonds issued by Fidelity and their respective renewal periods on behalf of Fidelity and its customers. In addition, Zurich initiates the renewal and/or continuation process of such AMC surety bonds on behalf of Fidelity and its customers.

19. Due to an internal processing error at or around the time the Bond was issued, Zurich miscoded the Bond in its systems as a "term" bond instead of a "continuous" bond.

20. As of January 2013, CCS was required to and did maintain active AMC surety bonds in order to maintain its AMC licenses in Alabama, Arizona, Arkansas, Georgia, Kentucky, Louisiana, Nebraska, New Mexico, Oregon, Tennessee, Utah and Washington. Each of these bonds was issued by Zurich or one of its subsidiaries, including but not limited to Fidelity.

21. As of January 2013, CoreLogic's other affiliated AMCs maintained an additional 62 active AMC surety bonds in the above-referenced states, each of which was issued by Zurich or one of its subsidiaries, including but not limited to Fidelity.

22. Upon information and belief, Zurich miscoded only the Bond as a term bond, and properly coded all other AMC surety bonds as continuous in its systems, including other AMC bonds in Utah.

23. As licensed sureties in all 50 states, including Utah, actively issuing AMC and other surety bonds to CCS, among others, Defendants were charged with knowing and did know that in order to maintain an AMC license in Utah, it was necessary for CCS to maintain a Utah AMC surety bond. Defendants likewise understood that continuation of CCS (and other CoreLogic) AMC surety bonds was

necessary for CCS (and other CoreLogic AMCs) to continue to conduct AMC operations in those states where bonds were required, including but not limited to Utah, and that the lapse of one of CCS's AMC bonds could lead to the suspension of its AMC license and in turn, the loss of significant RVS business nationwide.

24. The significant consequences CCS could face in the event of the suspension of one of its AMC licenses is underscored by the widely publicized regulatory scrutiny financial institutions, including many of CCS's customers, were under at all relevant times herein, with respect to retention and management of their third party vendors, including AMCs.

25. CoreLogic relied on Defendants to issue, process, and continue its AMC surety bonds in a careful and professional manner so as to ensure that its bonds would not be cancelled and that its AMC licenses would not be suspended for failure to maintain the required surety bonds.

26. At all relevant times, Defendants, among other things, undertook the responsibility to properly code CoreLogic's surety bonds in their internal systems, including but not limited to the Bond. Defendants also undertook the responsibility to provide notification, prior to the expiration of any renewable surety bond, that the surety bond needed to be renewed via a continuation certificate or other applicable mechanism, as well as the premium payment due for the issuance of such continuation certificate.

27. The above-described responsibilities undertaken by Defendants are consistent with the industry practice for the issuance and continuation of license-related surety bonds.

28. Defendants undertook and had a duty to properly code Corelogic's surety bonds in its systems and maintain those surety bonds so that they would not be cancelled, and to initiate the bond continuation process prior to the expiration of CoreLogic's surety bonds unless otherwise notified by CoreLogic.

29. In obtaining surety bonds from Defendants, CoreLogic relied upon

Defendants to fulfill their duty to properly code in their systems and maintain as active CoreLogic's surety bonds, so that they would not be cancelled, and to initiate the continuation process prior to the expiration of said bonds.

30. As alleged above, due to an internal processing error, which occurred at some point prior to the renewal date, Zurich miscoded the Utah Bond in its systems as a "term" bond instead of a continuous bond. CoreLogic did not know nor could it have known that Zurich had committed this processing error.

**Zurich's Admitted Failure to Properly Renew the Utah Bond and The Suspension of CCS's AMC License**

31. In or about October 2013, in accordance with both industry custom and practice, and in accordance with the duty that it undertook to CoreLogic, which it had performed in the renewal of dozens of other AMC surety bonds, Zurich initiated the renewal process and prepared and issued continuation certificates for all CoreLogic license-related surety bonds that were due for renewal in December 2013 and January 2014, *with the sole exception of CCS's Utah Bond*.

32. As a result of Defendants' failure to issue a continuation certificate for the Bond, the Division suspended CCS's Utah AMC License as of February 1, 2014.

33. CoreLogic first received notice that the Utah AMC License had been suspended on February 11, 2014.

34. That same day, Zurich was notified that CCS's Utah AMC license had been suspended for failure to provide a continuation certificate for the Bond. CoreLogic requested that a continuation certificate be immediately sent to the Division.

35. In response, Zurich acknowledged that it had "booked" the Bond "incorrectly as a 'term' bond" and apologized for the error. Zurich also advised that it had "re-written" the Bond "for the current term of January 1, 2014 to January 1, 2015 and amended it to show as a continuous bond, so renewals should continue to generate until [the] bond is no longer needed." This admission by Zurich further

evidences Zurich's duties and responsibilities and its awareness of those duties and responsibilities with respect to the renewal of surety bonds and with respect to the Bond, in particular.

36. On February 11, 2014, a Continuation Certificate for the Bond was issued and sent to the Division.

37. On February 12, 2014, the Division reinstated the Utah AMC License.

### CCS's Loss of Largest Client's RVS Business and Other Damages

38. On March 6, 2014, as a direct result of Defendants' admitted miscoding error, and the resulting license suspension, CCS's largest client, a well-known financial institution, advised CoreLogic that it had decided to suspend all RVS orders to CoreLogic Valuation Services as of March 8, 2014 (hereinafter, the "Shut-Off"). The Shut-Off not only applied to CoreLogic's Utah RVS business, but also included that customer's RVS business nationwide.

39. Zurich was notified on March 6, 2014 of the Shut-Off.

40. In response to learning of the Shut-Off, Defendants prepared and executed a letter to CoreLogic dated March 6, 2014, wherein Defendants admitted that "Due to an internal processing error [at Zurich], the bond was cancelled at the 01/01/2014 renewal date. When the error was brought to our attention on 02/11/2014, the bond was reinstated retroactively to 01/01/2014. Therefore, the bond has been continuous since 01/01/2013 and will be continuous in full force and effect until cancelled." A copy of Zurich's March 6, 2014 letter is attached hereto as **Exhibit 1** and is fully incorporated herein.

41. Despite CoreLogic's efforts to regain the lost RVS business, the business never resumed and in September 2014, CoreLogic sold CCS to a third party.

42. From March 2014 through September 2014, CoreLogic lost over $4.25 million in net profits that it would have earned from the RVS business but for Defendants' error.

43. In addition, the third party purchaser in the CCS Sale reduced its

purchase price of CCS by $10 million expressly because of the Shut-Off.

44. CoreLogic also expended significant time and resources on efforts to have the lapse of its license expunged from its Utah AMC record. CoreLogic retained counsel to assist in this process and made several written requests to the Division to remove the license lapse from its record. CoreLogic eventually filed a Petition for Agency Review to the Division in May 2014. By Order of the Division dated July 7, 2014, the license lapse was formally expunged from CCS's Utah AMC record. As the basis for its decision to expunge the license suspension, the Division stated that "Zurich's failure to provide the Division with a continuation certificate for the 2013 Bond was the direct result of a clerical error committed by a Zurich employee outside of CoreLogic's supervision and control."

**FIRST CAUSE OF ACTION**
**(Professional Negligence – All Defendants)**

45. Plaintiffs reallege and incorporate by reference each and every allegation contained in each Paragraph above as though fully set forth herein.

46. At all relevant times, Defendants are and were licensed in all 50 states to issue surety bonds, including Utah, and upon information and belief, do issue surety bonds on behalf of their customers, including CoreLogic, nationwide.

47. Defendants issued the Bond in favor of the Division on behalf of CCS which took effect on January 1, 2013. By its terms, the Bond could be renewed from year to year by continuation certificate executed by Fidelity.

48. Defendants knew that CoreLogic intended the Bond to be continuous in nature, given the prior custom and practice between the parties and industry practice in license-related surety bonds, and Defendants undertook the responsibility to properly code the Bond in their systems and to initiate the continuation process as outlined above.

49. As licensed sureties nationwide, including Utah, Defendants had the duty of a professional in the insurance and surety business to use such skill, prudence and

diligence as other members of the profession commonly possess and exercise, including but not limited to the duty to properly code the Bond as continuous and the duty to initiate the renewal process prior to the expiration of the Bond, as is customary in the surety industry and as Defendants had done in connection with the hundreds of other surety bonds Defendants had issued on behalf of CoreLogic entities, including but not limited to CCS.

50. Defendants admittedly breached their professional duty by failing to properly code the Bond as continuous and instead coding it "incorrectly as a 'term' bond."

51. As a result of Defendants' admitted breach, Defendants failed to issue the continuation certificate for the Bond. Defendants acknowledged that they knew the Bond was meant to be continuous by "reinstat[ing] the bond retroactively to 01/01/2014" to show that the bond had "been continuous since 01/01/2013 and will be continuous in full force and effect until cancelled." *See* Exhibit 1.

52. As the actual and proximate result of Defendants' breach of their professional duty, CoreLogic's Utah AMC license was suspended, and CoreLogic lost the RVS business of its largest client. It was reasonably foreseeable to Defendants that Defendants' negligent conduct could cause CoreLogic to lose significant RVS business nationwide.

53. Thus, as a result of Defendants' breach, CoreLogic sustained approximately $4.25 million in net lost profits from March 8, 2014 through September 2014, when CCS was sold.

54. In addition, the buyer reduced its purchase price of CCS by $10 million expressly because of the Shut-Off. Thus, as a result of Defendants' breach, CoreLogic sustained an additional $10 million loss.

55. CoreLogic also expended significant time and resources on efforts to have the lapse of its license expunged from its Utah AMC record, including retaining counsel who made several written requests to the Division and eventually filed a

Petition for Agency Review to the Division in May 2014. Finding that the failure to issue the continuation certificate was the "direct result of a clerical error committed by a Zurich employee outside of CoreLogic's supervision and control," the Division expunged the license suspension from CoreLogic's AMC Utah licensing history by Order date July 7, 2014. The cost and value of the foregoing expenditure of time and resources are further damages suffered by CoreLogic as a result of Defendants' breach.

56. Had Defendants used proper skill and care in coding the Bond when it was initially issued, or had Defendants used proper skill and care issuing a continuation certificate for the Utah Bond on or before the January 1, 2014 renewal date, CoreLogic's largest client would not have suspended its RVS orders to CoreLogic and CoreLogic would not have sustained damages.

## SECOND CAUSE OF ACTION
### (Negligence Against All Defendants)

57. Plaintiffs reallege and incorporate by reference each and every allegation contained in each Paragraph above as though fully set forth herein.

58. At all relevant times, Defendants are and were licensed in all 50 states to issue surety bonds, including Utah, and upon information and belief, do issue surety bonds on behalf of their customers, including CoreLogic, nationwide.

59. Defendants issued the Bond in favor of the Division on behalf of CCS which took effect on January 1, 2013. By its terms, the Bond could be renewed from year to year by continuation certificate executed by Fidelity.

60. Defendants knew that CoreLogic intended the Bond to be continuous in nature, given the prior custom and practice between the parties and industry practice in license-related surety bonds, and undertook the responsibility to properly code the Bond in its systems and to initiate the continuation process as outlined above.

61. Defendants had the duty to use such skill, prudence and diligence of a reasonable surety, including but not limited to the duty to properly code the Bond as

continuous and the duty to initiate the renewal process prior to the expiration of the Bond, as is customary in the surety industry and as Defendants had done in connection with the hundreds of other surety bonds Defendants had issued on behalf of CoreLogic.

62. Defendants admittedly breached their duty by failing to properly code the Bond as continuous and instead coding it "incorrectly as a 'term' bond."

63. As a result of Defendants' admitted breach by improperly coding the bond as a term bond instead of a continuous bond, Defendants failed to issue the continuation certificate. Defendants acknowledged that they knew the Bond was meant to be continuous by "reinstat[ing] the bond retroactively to 01/01/2014" to show that the bond had "been continuous since 01/01/2013 and will be continuous in full force and effect until cancelled." *See* Exhibit 1.

64. As the actual and proximate result of Defendants' breach of their professional duty, CoreLogic's Utah AMC license was suspended, and CoreLogic lost the RVS business of its largest client, as of March 8, 2014. It was reasonably foreseeable to Defendants that Defendants' negligent conduct could cause CoreLogic to lose significant RVS business nationwide.

65. Thus, as a result of Defendants' breach, CoreLogic sustained approximately $4.25 million in net lost profits from March 8, 2014 through September 2014, when CCS was sold.

66. CoreLogic sustained another $10 million in losses when the purchaser of CCS reduced its purchase price expressly because of the Shut-Off. Thus, as a result of Defendants' breach, CoreLogic sustained an additional $10 million loss.

67. CoreLogic also expended significant time and resources on efforts to have the lapse of its license expunged from its Utah AMC record, including retaining counsel who made several written requests to the Division and eventually filed a Petition for Agency Review to the Division in May 2014. Finding that the failure to issue the continuation certificate was the "direct result of a clerical error committed by

a Zurich employee outside of CoreLogic's supervision and control," the Division expunged the license suspension from CoreLogic's AMC Utah licensing history by Order date July 7, 2014. The cost and value of the foregoing expenditure of time and resources are further damages suffered by CoreLogic as a result of Defendants' breach.

68. Had Defendants used proper skill and care in coding the Bond when it was initially issued, or had Defendants used proper skill and care issuing a continuation certificate for the Bond on or before the January 1, 2014 renewal date, CoreLogic's largest customer would not have suspended its RVS orders to CoreLogic and CoreLogic would not have sustained damages.

WHEREFORE, Plaintiffs pray for relief as hereinafter set forth to be determined by a jury pursuant to Civil L.R. 3-6.

WHEREFORE, Plaintiffs pray for judgment against Defendants, jointly and severally, as follows:

(1) For compensatory damages in an amount more than $75,000 to be shown according to proof at the time of trial;

(2) For costs of suit incurred herein;

(3) For all other and further relief as the Court may deem just and proper.

DATED: July 2, 2015

REED SMITH LLP

By: /s/ David E. Weiss
David E. Weiss (SBN 148147)
Carolee A. Hoover (SBN 282018)
Attorneys for Plaintiffs

# EXHIBIT 1



Zurich North America Surety

525 Market Street,, Suite 2900
San Francisco, Ca. 94105

Phone: 415-538-7162
www.zurichna.com

March 6, 2014

Steve Tomeo
Analyst, Risk Management
Corporate Shared Services
CoreLogic
40 Pacifica, Suite 900
Irvine, CA 92618

Re: Bond #LPM 9044150

Dear Mr. Tomeo:

This letter hereby notifies CoreLogic and the Utah Department of Commerce, Division of Real Estate that bond 9044150 written on behalf of CoreLogic Collateral Solutions, LLC remains in full force and effect.

Due to an internal processing error, the bond was cancelled at the 01/01/2014 renewal date. When the error was brought to our attention on 02/11/2014, the bond was reinstated retroactively to 01/01/2014. Therefore, the bond has been continuous since 01/01/2013 and will be continuous in full force and effect until cancelled.

If you have additional questions or concerns, please do not hesitate to contact me.

Sincerely,

Rebecca Heinlein

Rebecca Heinlein
Attorney-in-Fact, Fidelity and Deposit Company of Maryland

**ZURICH AMERICAN INSURANCE COMPANY**
**COLONIAL AMERICAN CASUALTY AND SURETY COMPANY**
**FIDELITY AND DEPOSIT COMPANY OF MARYLAND**
**POWER OF ATTORNEY**

KNOW ALL MEN BY THESE PRESENTS: That the ZURICH AMERICAN INSURANCE COMPANY, a corporation of the State of New York, the COLONIAL AMERICAN CASUALTY AND SURETY COMPANY, a corporation of the State of Maryland, and the FIDELITY AND DEPOSIT COMPANY OF MARYLAND a corporation of the State of Maryland (herein collectively called the "Companies"), by **JAMES M. CARROLL, Vice President**, in pursuance of authority granted by Article V, Section 8, of the By-Laws of said Companies, which are set forth on the reverse side hereof and are hereby certified to be in full force and effect on the date hereof, do hereby nominate, constitute, and appoint **Rebecca HEINLEIN, of San Francisco, California,** its true and lawful agent and Attorney-in-Fact, to make, execute, seal and deliver, for, and on its behalf as surety, and as its act and deed: **any and all bonds and undertakings**, and the execution of such bonds or undertakings in pursuance of these presents, shall be as binding upon said Companies, as fully and amply, to all intents and purposes, as if they had been duly executed and acknowledged by the regularly elected officers of the ZURICH AMERICAN INSURANCE COMPANY at its office in New York, New York., the regularly elected officers of the COLONIAL AMERICAN CASUALTY AND SURETY COMPANY at its office in Owings Mills, Maryland., and the regularly elected officers of the FIDELITY AND DEPOSIT COMPANY OF MARYLAND at its office in Owings Mills, Maryland., in their own proper persons.

The said Vice President does hereby certify that the extract set forth on the reverse side hereof is a true copy of Article V, Section 8, of the By-Laws of said Companies, and is now in force.

IN WITNESS WHEREOF, the said Vice-President has hereunto subscribed his/her names and affixed the Corporate Seals of the said ZURICH AMERICAN INSURANCE COMPANY, COLONIAL AMERICAN CASUALTY AND SURETY COMPANY, and FIDELITY AND DEPOSIT COMPANY OF MARYLAND, this 2nd day of August, A.D. 2012.

ATTEST:

ZURICH AMERICAN INSURANCE COMPANY
COLONIAL AMERICAN CASUALTY AND SURETY COMPANY
FIDELITY AND DEPOSIT COMPANY OF MARYLAND

  

By: _____
*Assistant Secretary*
*Eric D. Barnes*

_____
*Vice President*
*James M. Carroll*

State of Maryland
City of Baltimore

On this 2nd day of August, A.D. 2012, before the subscriber, a Notary Public of the State of Maryland, duly commissioned and qualified, JAMES M. CARROLL, Vice President, and ERIC D. BARNES, Assistant Secretary, of the Companies, to me personally known to be the individuals and officers described in and who executed the preceding instrument, and acknowledged the execution of same, and being by me duly sworn, deposeth and saith, that he/she is the said officer of the Company aforesaid, and that the seals affixed to the preceding instrument are the Corporate Seals of said Companies, and that the said Corporate Seals and the signature as such officer were duly affixed and subscribed to the said instrument by the authority and direction of the said Corporations.

IN TESTIMONY WHEREOF, I have hereunto set my hand and affixed my Official Seal the day and year first above written.

_____
Maria D. Adamski, Notary Public
My Commission Expires: July 8, 2015

**EXTRACT FROM BY-LAWS OF THE COMPANIES**

"Article V, Section 8, <u>Attorneys-in-Fact</u>. The Chief Executive Officer, the President, or any Executive Vice President or Vice President may, by written instrument under the attested corporate seal, appoint attorneys-in-fact with authority to execute bonds, policies, recognizances, stipulations, undertakings, or other like instruments on behalf of the Company, and may authorize any officer or any such attorney-in-fact to affix the corporate seal thereto; and may with or without cause modify of revoke any such appointment or authority at any time."

**CERTIFICATE**

I, the undersigned, Vice President of the ZURICH AMERICAN INSURANCE COMPANY, the COLONIAL AMERICAN CASUALTY AND SURETY COMPANY, and the FIDELITY AND DEPOSIT COMPANY OF MARYLAND, do hereby certify that the foregoing Power of Attorney is still in full force and effect on the date of this certificate; and I do further certify that Article V, Section 8, of the By-Laws of the Companies is still in force.

This Power of Attorney and Certificate may be signed by facsimile under and by authority of the following resolution of the Board of Directors of the ZURICH AMERICAN INSURANCE COMPANY at a meeting duly called and held on the 15th day of December 1998.

RESOLVED: "That the signature of the President or a Vice President and the attesting signature of a Secretary or an Assistant Secretary and the Seal of the Company may be affixed by facsimile on any Power of Attorney...Any such Power or any certificate thereof bearing such facsimile signature and seal shall be valid and binding on the Company."

This Power of Attorney and Certificate may be signed by facsimile under and by authority of the following resolution of the Board of Directors of the COLONIAL AMERICAN CASUALTY AND SURETY COMPANY at a meeting duly called and held on the 5th day of May, 1994, and the following resolution of the Board of Directors of the FIDELITY AND DEPOSIT COMPANY OF MARYLAND at a meeting duly called and held on the 10th day of May, 1990.

RESOLVED: "That the facsimile or mechanically reproduced seal of the company and facsimile or mechanically reproduced signature of any Vice-President, Secretary, or Assistant Secretary of the Company, whether made heretofore or hereafter, wherever appearing upon a certified copy of any power of attorney issued by the Company, shall be valid and binding upon the Company with the same force and effect as though manually affixed.

IN TESTIMONY WHEREOF, I have hereunto subscribed my name and affixed the corporate seals of the said Companies, this 6 day of March, 2014.

  

Thomas O. McClellen, Vice President