UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

CORELOGIC, INC., et al.,

  Plaintiffs,

  v.

ZURICH AMERICAN INSURANCE
COMPANY, et al.,

  Defendants.

Case No.  15-cv-03081-RS

**ORDER DENYING MOTION FOR
SUMMARY JUDGMENT**

## I. INTRODUCTION

Defendant Zurich American Insurance Company ("Zurich") provides commercial surety bonds to businesses in the United States through its American subsidiary, defendant Fidelity and Deposit Company of Maryland ("F&D").  In 2012, CoreLogic Collateral Solutions, LLC ("CCS") sought a bond needed to do business in Utah, and accordingly contacted defendants through its designated broker of record.  The broker issued the bond on F&D's behalf, and sent it to Zurich for processing.  Zurich, unfortunately, coded the bond improperly into its internal records.  The upshot is the bond lapsed a year later, and Utah suspended CCS's license, which ultimately caused CoreLogic, Inc. (the parent company), to lose its biggest client.  CoreLogic now sues on behalf of itself and a host of affiliated entities alleging Zurich and F&D committed both professional negligence and ordinary negligence.[1]  Defendants move for summary judgment principally on the theory that any recovery lies in contract, as opposed to in tort.

[1] The plaintiffs in this case specifically include CoreLogic, Inc., the parent company, CoreLogic Solutions, LLC, a subsidiary, and CoreLogic Default Information Services, LLC ("CDIS"), another subsidiary that was the parent company of CCS before CCS was sold.  These entities will be referred to collectively as "CoreLogic."  Additionally, defendants will be referred to collectively as "Zurich."

United States District Court
Northern District of California

United States District Court
Northern District of California

For the reasons explained below, defendants' motion for summary judgment is denied. Plaintiffs do not assert Zurich failed to perform a duty that stems from the text of the bond. Additionally, a reasonable jury could conclude commercial surety bond issuers are subject to a professional standard of care.  Accordingly, plaintiffs state and substantiate appropriately their pair of negligence claims, and defendants have not shown summary judgment is warranted in their favor.

## II. BACKGROUND[2]

In 2012, CCS obtained a license in Utah to operate as an appraisal management company ("AMC").  The Utah Commerce Department also began requiring AMCs to have a surety bond in place as a condition of doing business in the state.[3]  Accordingly, CCS, a subsidiary of CoreLogic, Inc., reached out to F&D, as F&D had been issuing commercial surety bonds for CoreLogic, Inc. entities since 2010.  Heinlein Decl. ¶ 4.

CCS communicated its request for a "License and Permit" bond through CoreLogic, Inc.'s designated broker of record, Marsh Risk and Insurance Services ("Marsh").  It started the process by sending Utah's statutory bond form and a completed Bond Request Worksheet to Marsh for review on November 26, 2012.  Def.'s Index Exs. 2, 3.  Marsh was authorized to bind F&D and Zurich through a previously executed power of attorney.  *Id.* Ex. 1.  Marsh soon issued the bond, naming CCS as "Principal" and F&D as "Surety."  *Id.* Ex. 4.  The terms bound CCS and F&D to Utah's Division of Real Estate ("Division") in the sum of $25,000 to secure CCS's obligation to comply with the statutes and regulations applicable to AMCs.  *Id.*  The bond applied during the period beginning on January 1, 2013, and ending on January 1, 2014, and provided it "may be renewed from year to year by *continuation certificate* executed by said Surety."  *Id.* (emphasis

---

[2] Defendants request judicial notice be taken of the "Company Overview" page of plaintiffs' website.  *See* Dkt. No. 34.  The request will be granted, as it is consistent with Rule 201 of the Federal Rules of Evidence.

[3] A surety bond is a third-party insurance contract that renders the surety responsible to another party for the obligation or conduct of the principal.

1  added).  CCS paid F&D a $208.00 premium for issuing the bond.  *Id.* Ex. 6.  CCS transmitted the

2  bond to the Division on December 7, 2012.  *Id.* Ex. 7.

3       F&D received the bond the same day it was issued on its behalf by Marsh.  *Id.* Ex. 5.

4  Pursuant to its practices, F&D forwarded the bond for registration into Zurich's Internet-based

5  processing system.[4]  *Id.*  Crucially, Marva Stewart, a Zurich employee, incorrectly identified the

6  bond's form of renewal as "term."  Def.'s Index Ex. 5.  A "term" bond is written for a discrete

7  period of time and expected to terminate on a specific date.  Heinlein Dep. 67:18–22.  The correct

8  form of renewal was "continuation certificate," which obliges the surety company or its agent to

9  issue a certificate to continue the bond for another term.  *Id.* 67:14–17; Boucher Decl. ¶ 7.  The

10  bond ultimately was coded erroneously into Zurich's system as "term."  Hayley Decl. ¶ 8.  Neither

11  CoreLogic nor CCS was notified Zurich had coded the bond incorrectly.

12       The bond period ended on January 1, 2014.  Prior to that date, CoreLogic changed its

13  designated broker from Marsh to Lockton Insurance Brokers, LLC ("Lockton").  Def.'s Index Ex.

14  19.  Given the bond was erroneously coded as "term," F&D took no action to renew it.  Haley

15  Decl. ¶ 9.  Had it properly been coded, F&D would have issued a continuation certificate and sent

16  it to Lockton for execution in advance of the term's expiration.  Haley Decl. ¶ 9; Shively Decl. Ex.

17  14.

18       On February 1, 2014, thirty days after the end of the bond term, the Division suspended

19  CCS's license to operate as an AMC.  Pl.'s Index Ex. 4.  CCS submits it received notice of the

20  suspension on February 11, 2014, and requested immediately a continuation certificate be sent to

21  the Division.  *See id.* Ex. 9.  Lockton forwarded the request to Zurich and inquired whether the

22  bond was active.[5]  *Id.*  Zurich responded its system showed the bond as "closed" because it was

23

24  [4] Specifically, Kathy Mair, of Marsh, forwarded the bond to Joe Wayne, of Zurich, who sent it to
    Marva Stewart, also of Zurich, who forwarded it to the processing center.  Def.'s Index Ex. 5.

25  Zurich was responsible for identifying the form of renewal and coding that information
    appropriately into its systems.  Boucher Decl. ¶ 4.

26

27  [5] The request was forwarded to Donna Kelley, a Senior Surety Underwriting Assistant for Zurich,
    who was authorized to act on behalf of F&D.  Heinlein Decl. ¶ 11; Pl.'s Index Ex. 9.

28

United States District Court
Northern District of California

1    "booked incorrectly as a 'term' bond." *Id.* Zurich further represented it had rewritten the bond for

2    January 1, 2014, to January 1, 2015, "and amended it to show as a continuous bond, so renewals

3    should continue to generate until [the] bond is no longer needed." *Id.* On behalf of F&D,

4    Lockton issued a continuation certificate reinstating the bond retroactively as of January 1, 2014.

5    Def.'s Index Ex. 13. The Division reinstated CCS's license on February 12, 2014, but it had

6    lapsed for eleven days.

7         On March 6, 2014, CoreLogic's main customer, Wells Fargo Bank, advised it was

8    "suspend[ing] all orders submitted to Corelogic Valuation Services" after "reviewing the recent

9    Corelogic compliance violation." *Id.* Ex. 14. The shutoff applied not only to Utah business, but to

10   CoreLogic business throughout the country. CoreLogic believes this result was foreseeable given

11   the regulatory requirements facing financial institutions described in CoreLogic's 10-K. Shively

12   Decl. Ex. 5.

13        On the same date as the shutoff, at Lockton's request, F&D wrote a letter explaining the

14   bond had been "cancelled" due to an internal processing error, but was reinstated retroactively to

15   the start of the year. Def.'s Index Exs. 16, 17. CoreLogic later sued to remove the suspension,

16   and on July 7, 2014, the Division formally expunged the license lapse from CCS's record. Pl.'s

17   Index Ex. 13. The Division concluded the failure to provide a continuation certificate "was the

18   direct result of a clerical error committed by a Zurich employee outside of CoreLogic's

19   supervision and control." *Id.*

20        At the time of the bond's lapse, CoreLogic was in the midst of negotiating to sell CCS.

21   The deal eventually completed in September 2014. CoreLogic submits it lost over $4.25 million it

22   would have earned had Wells Fargo not suspended its business prior to the sale. Def.'s Index Ex.

23   20. In addition, the CCS buyer allegedly reduced the purchase price by $10 million expressly

24   because of the lost future business with Wells Fargo. *Id.*

25        CoreLogic, through counsel, sent Zurich a letter on November 12, 2014, notifying Zurich it

26   sought damages in excess of $15 million. Prior to that date, Zurich submits it lacked knowledge

27   of CoreLogic's nationwide business relationship with Wells Fargo, and states it was unaware

28

United States District Court
Northern District of California

CoreLogic intended to sell CCS, or that CCS had been sold.  Haley Decl. ¶¶ 11, 15, 16, 20.  Zurich

further disclaims professional experience with the strict regulatory environment to which banks

and service providers are subject.  *Id.* ¶ 13.  CoreLogic, however, disputes each of these assertions.

It notes, among other things, it entered into an indemnity agreement with Zurich in 2011 to

provide security for all bonds issued by Zurich to CoreLogic entities nationwide, Pl.'s Index Ex. 6,

Zurich issued over 200 individual bonds for CoreLogic, Haley Dep. 146:2–8, CoreLogic's 10-K

disclosed it services Wells Fargo and other large mortgage originators, Pl.'s Index Ex. 5, and

Zurich published a whitepaper observing "[r]egulators are intensifying their focus on vendor

management within financial institutions," *Id.* Ex. 20.

On July 2, 2015, CoreLogic brought suit against the defendants alleging they committed

professional negligence and ordinary negligence.  Dkt. No. 1.  Zurich and F&D moved for

summary judgment on both claims in July 2016.

### III. LEGAL STANDARD

Summary judgment is proper "if the pleadings and admissions on file, together with the

affidavits, if any, show that there is no genuine issue as to any material fact and that the moving

party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The purpose of summary

judgment "is to isolate and dispose of factually unsupported claims or defenses."  *Celotex v.*

*Catrett*, 477 U.S. 317, 323–24 (1986).  The moving party "always bears the initial responsibility

of informing the district court of the basis for its motion, and identifying those portions of the

pleadings and admissions on file, together with the affidavits, if any which it believes demonstrate

the absence of a genuine issue of material fact."  *Id*. at 323 (citations and internal quotation marks

omitted).  If it meets this burden, the moving party is then entitled to judgment as a matter of law

when the non-moving party fails to make a sufficient showing on an essential element of the case

with respect to which he bears the burden of proof at trial.  *Id*. at 322–23.

The non-moving party "must set forth specific facts showing that there is a genuine issue

for trial."  Fed. R. Civ. P. 56(e).  The non-moving party cannot defeat the moving party's properly

supported motion for summary judgment simply by alleging some factual dispute between the

parties.  To preclude the entry of summary judgment, the non-moving party must bring forth material facts, *i.e.*, "facts that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  "Factual disputes that are irrelevant or unnecessary will not be counted." *Id.*  The opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 588 (1986).

The court must draw all reasonable inferences in favor of the non-moving party, including questions of credibility and of the weight to be accorded particular evidence. *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496 (1991) (citing *Anderson*, 477 U.S. at 255); *Matsushita*, 475 U.S. at 588 (1986).  It is the court's responsibility "to determine whether the 'specific facts' set forth by the nonmoving party, coupled with undisputed background or contextual facts, are such that a rational or reasonable jury might return a verdict in its favor based on that evidence." *T.W. Elec. Serv. v. Pac. Elec. Contractors*, 809 F.2d 626, 631 (9th Cir. 1987).  "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. However, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587.

### IV. DISCUSSION

Zurich insists CoreLogic misconceptualized this case and accordingly moves for summary judgment on the ground plaintiffs' claims arise only in contract, as opposed to in tort.  Defendants further maintain that even if styled as a tort, they did not owe any legal "duty," and contend surety bond issuers are not subject to any "professional" standard of care.  None of these arguments warrant the entry of summary judgment.

### A. Contract or Tort

Zurich takes aim at both negligence claims because it envisions them fundamentally to be premised on its alleged failure to perform a *contractual* obligation arising from the text of the bond.  The bond provides it "may be renewed from year to year by continuation certificate

United States District Court
Northern District of California

executed by [F&D]," and it is the alleged breach of that duty, according to Zurich, that lies at the

core of plaintiffs' claims.  Given "[a] person may not ordinarily recover in tort for the breach of

duties that merely restate contractual obligations," Zurich insists the case may proceed only as an

alleged breach of contract.[6]  *Aas v. Superior Court*, 24 Cal. 4th 627, 643 (2000).

Plaintiffs, however, do not assert Zurich failed to perform a duty that stems from the terms

of the bond, which they contend, in any event, simply obliged Zurich to pay Utah $25,000 if CCS

violated the AMC regulations.  Instead, the alleged injury stems from Zurich's failure to record the

bond properly in its internal records, a subject on which the text of the bond is completely silent.

In other words, the negligence lies in a *service* Zurich provides in connection with its issuance of

bonds, one that customers rely on apparently to ensure bond continuance, where it is warranted.[7]

Boucher Decl. ¶ 7.  Zurich touts its "unrivaled tradition of leading the surety industry in

underwriting knowledge, expertise and *quality service*," Pl.'s Index Ex. 1 (emphasis added), and

plaintiffs submit evidence, albeit subject to dispute, about the industry's customs and practices,

*see* Boucher Decl. ¶¶ 5, 6, 8.[8]  Plaintiffs accordingly state their claims under the banner of

professional negligence, and California authority establishes Zurich is not entitled to summary

judgment simply because they decided to do so.  Specifically, the cases decided subsequent to *Aas*

---

[6] Zurich further maintains the economic loss plaintiffs claim was not contemplated by the parties when the bond was issued, and thus consequential damages cannot be recovered.  *See Lewis Jorge Constr. Mgmt., Inc. v. Pomona Unified Sch. Dist.*, 34 Cal. 4th 960, 968–69 (2004).  The foreseeability of CoreLogic's particular injury is a disputed issue to be considered by the jury in determining, among other things, whether defendants were negligent and if the negligence proximately caused plaintiffs' injury.  *See Ballard v. Uribe*, 41 Cal. 3d 564, 582 n.6 (1986).

[7] Zurich "readily admits that its customers rely upon the bonds issued to ensure they can operate in the applicable state, and that if the bond is not issued correctly, the customer's right to operate can be suspended."  Reply at 10:5–7.  Zurich therefore provides specific training to its employees on how to identify properly the form of renewal for commercial surety bonds.  *See* Pl.'s Index Ex. 3.

[8] Defendants object to these paragraphs, arguing plaintiffs failed to establish Boucher is a qualified expert with specialized knowledge that would help the trier of fact.  *See* Dkt. No. 42.  Their objection is overruled.  Boucher is a Senior Vice President and head of the surety department for Lockton.  Boucher Decl. ¶ 1.  He has worked in the surety industry since 1980, *id.* ¶ 2, and offers his views on the industry's customs and practices based on his thirty five years of experience, *id.* ¶ 5.

1   and *Erlich v. Menezes*, 21 Cal. 4th 543 (1999)—the two decisions on which defendants rely—

2   "continue to apply a rule that negligent failure to exercise reasonable care and skill in undertaking

3   to perform a professional services contract is a tort as well as a breach of contract."  *City and Cnty.*

4   *of San Francisco v. Cambridge Integrated Servs. Grp., Inc.*, No. C 04-1523 VRW, 2007 WL

5   1970092, at *4 (N.D. Cal. July 2, 2007); *see also Moreno v. Sanchez*, 106 Cal. App. 4th 1415,

6   1435 (2003) ("Under the common law the established rule is the negligent failure to exercise

7   reasonable care and skill in undertaking to perform a service contract of this type is a tort, as well

8   as a breach of contract.").

9        Moving on, defendants object that even if styled as a tort, the economic loss rule bars

10  plaintiffs' recovery.  That rule "has been applied to bar a plaintiff's tort recovery of economic

11  damages unless such damages are accompanied by some form of *physical* harm (i.e., personal

12  injury or property damage)."  *N. Am. Chem. Co. v. Superior Court*, 59 Cal. App. 4th 764, 777

13  (1997).  *North American*, however, explained the rule "has not been applied in California to limit a

14  plaintiff's tort damages" when "plaintiff's loss arises from a negligent performance of services."

15  59 Cal. 4th at 777.  Here, plaintiffs do not allege their injury stems from the purchase of a

16  defective product.  Rather, they argue instead defendants negligently performed an attendant

17  professional service.  The economic loss rule therefore does not apply to the instant case.  *See*

18  *Cambridge Integrated*, 2007 WL 1970092 at *2 (finding California courts "distinguish[] cases

19  involving defective products, for which the economic loss rule applies, and those involving

20  defective services, for which the economic loss rule does not apply").

21     **B. Duty**

22        Defendants next contend plaintiffs cannot demonstrate the requisite "duty."  To sustain the

23  professional negligence claim, plaintiffs must show "(1) the existence of the duty of the

24  professional to use such skill, prudence, and diligence as other members of the profession

25  commonly possess and exercise; (2) breach of that duty; (3) a causal connection between the

26  negligent conduct and the resulting injury; and (4) actual loss or damage resulting from the

27  professional negligence."  *Hasso v. Hapke*, 227 Cal. App. 4th 107, 153 (2014).  Plaintiffs' simple

28

United States District Court
Northern District of California

8

United States District Court
Northern District of California

negligence claim encompasses the same elements but involves an ordinary standard of care. *See McIntyre v. Colonies-Pac., LLC*, 228 Cal. App. 4th 664, 671 (2014); *Ballard v. Uribe*, 41 Cal. 3d 564, 582 n.6 (1986) ("In California, the general rule is that all persons have a duty to use ordinary care to prevent others being injured as the result of their conduct.") (internal quotation marks omitted).

"The question of 'duty' is decided by the court, not the jury." *Ballard*, 41 Cal. 3d at 582 n.6. Foreseeability is the "chief factor in the duty analysis." *Pedeferri v. Seidner Enters.*, 216 Cal. App. 4th 359, 366 (2013) (quotation marks and alteration omitted). As such, defendants contend the undisputed evidence belies the existence of any duty because the loss alleged could not be foreseen at the time Zurich issued the bond through its agent. Zurich submits it lacked knowledge of CoreLogic's nationwide business relationship with Wells Fargo, and disclaims professional experience with the strict regulatory environment to which banks and service providers are subject. Haley Decl. ¶¶ 11, 13. As detailed above, however, CoreLogic provides evidence disputing each of these allegations, and in any event, Zurich misconstrues the level of generality at which the foreseeability analysis applies. As *Ballard* explained, "a court's task—in determining 'duty'— is not to decide whether a *particular* plaintiff's injury was reasonably foreseeable in light of a *particular* defendant's conduct," but rather "to evaluate more generally whether the category of negligent conduct at issue is sufficiently likely to result in the kind of harm experienced that liability may appropriately be imposed on the negligent party." 41 Cal. 3d at 582 n.6. Framed in that way, Zurich concedes CoreLogic suffered a foreseeable "kind of harm," stating "it is foreseeable that a failure to renew a bond could cause the bond purchaser to lose income because of its inability to accept assignments while its license is suspended."[9] Reply at 2:16–18.

### C. Professional Negligence Standard of Care

Shifting gears, Zurich narrows its aim to the standard of care applicable to professional

---

[9] Given the type of harm is foreseeable, the additional policy factors defendants invoke need not be reached, though they would not alter the analysis.

United States District Court
Northern District of California

1    negligence, arguing the issuance of license bonds does not constitute a "professional" service.

2    Disputed issues of material fact preclude that finding here.

3    To make out their claim, plaintiffs must establish there is a particular standard of care

4    associated with the profession of buying and managing commercial surety bonds.

5    Professionalized standards of care have been extended to law, home inspection, home

6    construction, environmental consultation, and the business conducted by insurance agents and

7    brokers. *See Music Grp. Macao Commercial Offshore Ltd. v. Foote*, No. 14–cv–03078–JSC, 2015

8    WL 3882448, at *16 (N.D. Cal. June 23, 2015) (collecting cases).

9    Plaintiffs submit in the surety bond industry, and especially as to license and permit bonds,

10   there is a professional standard of care requiring surety companies properly to identify the form of

11   renewal and to code that information correctly to ensure bonds are not wrongly cancelled. *See*

12   Boucher Decl. ¶ 5.  Zurich "readily admits that its customers rely upon the bonds issued to ensure

13   they can operate in the applicable state, and that if the bond is not issued correctly, the customer's

14   right to operate can be suspended."  Reply at 10:5–7.  Recognizing these implications, plaintiffs

15   note Zurich touts its standing as a "leader" in the industry on customer service, Pl.'s Index Ex. 1,

16   bolstering the inference that a heightened standard of care applies in this particular context.

17   Plaintiffs also note the "standard practice" that "a surety bond with a continuation certificate form

18   of renewal will remain in force until the client notifies the surety agent that the surety bond is no

19   longer required." *Id.* ¶ 8.

20   In allegedly deviating from these standards, plaintiffs analogize Zurich to an insurance

21   agent who can be held liable in tort for a "failure to exercise reasonable care with regard to the

22   obtaining or maintenance of insurance." *Hydro-Mill Co., Inc. v. Hayward, Tilton and Rolapp Ins.*

23   *Assocs., Inc.*, 115 Cal. App. 4th 1145, 1153 (2004).  Plaintiffs also invoke persuasive authority

24   suggesting surety bond issuers can be held liable in negligence. *See, e.g.*, *Jim's Hot Shot Serv.,*

25   *Inc. v. Cont'l W. Ins. Co.*, 353 N.W.2d 279, 280–81 (N.D. 1984) (surety company held liable for

26   negligence when it erroneously filed a statement with a public agency that a bond had been

27   canceled); *L.G. Defelice, Inc. v. Fireman's Ins Co*, 41 F. Supp. 2d 152, 164 (D. Conn. 1998)

28

(finding disputed issue of fact as to the standard of care applicable to surety agent).

Viewing the undisputed evidence in the light most favorable to CoreLogic, a reasonable jury could conclude commercial surety bond issuers are subject to a professionalized standard of care. *See Music Grp.*, 2015 WL 3882448 at *17 (finding triable issue as to whether members of "corporate IT security profession" were subject to particular standard of care).  Accordingly, Zurich's motion for summary judgment must be denied.

**V. CONCLUSION**

Defendants' motion for summary judgment on plaintiffs' professional negligence and negligence claims is denied.

**IT IS SO ORDERED**.

Dated: September 8, 2016

_____
RICHARD SEEBORG
United States District Judge